# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **THERESA HARRIS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 08-C-1893** |
| | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Theresa Harris seeks judicial review of a final decision made by the Commissioner of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") and Supplementary Security Income ("SSI") under Title II and Title XVI of the Social Security Act. Pursuant to the Commissioner filing a motion for Summary Judgment, this Court must decide whether to affirm, reverse, or remand that decision. This Court grants the plaintiff's motion to remand [dkt 25] and denies the Commissioner's motion to affirm [dkt 31].

## PROCEDURAL HISTORY

December 31, 2003 was the last date on which plaintiff was eligible for DIB and SSI.[1] On May 4, 2004, plaintiff protectively filed for DIB and SSI claiming disability since December 13, 2001.[2] Plaintiff later amended this disability date to December 30, 2003.[3] She alleged in her DIB and SSI application that she suffered from lumbar stenosis, which prevented her from being able to walk

---

[1]R. 14.
[2]R. 100.
[3]R. 14.

without a walker or a cane.[4] Plaintiff's application stated that her illness began on December 22, 1994, and became so severe by December 13, 2001 that she could no longer work.[5] On November 18, 2004, the SSA denied her application.[6] On January 13, 2005, plaintiff filed a timely request for reconsideration, noting in her disability report that her medical condition had not changed.[7] On March 10, 2005, the SSA denied plaintiff's request for reconsideration, so on April 29, 2005, plaintiff filed a request for a hearing by an administrative law judge ("ALJ").[8] On August 16, 2006, ALJ Joseph Donovan presided over a hearing finding plaintiff not disabled and denying her application for DIB and SSI.[9] On June 11, 2007, plaintiff filed a request for review of the ALJ's decision.[10]

## STATEMENT OF FACTS

Born on September 6, 1953, plaintiff was fifty-two years old when she appeared before the ALJ.[11] She had completed high school and graduated from a four year institution with a liberal arts degree.[12] After graduating from college, plaintiff worked as a data-entry operator in a post office and as a mail room supervisor in an electronic supervising company.[13]

In 1994, plaintiff was involved in a head-on automobile collision and soon after began experiencing back pain and muscle spasms.[14] Even as she complained to her doctors of severe back

---

[4]R. 103.
[5]R. 104.
[6]R. 85.
[7]R. 86, 126
[8]R. 88-90, 92.
[9]R. 14-21.
[10]R. 551-54.
[11]R. 559.
[12]R. 558.
[13]R. 114.
[14]R. 578.

pain that prevented her from walking properly, she worked full-time as: a group home assistant responsible for monitoring mentally handicapped patients; an in-school detention, suspension, and study-hall supervisor; and finally; a substitute teacher.[15] On December 13, 2001, plaintiff terminated her employment as a suspension supervisor and has not attempted to work again.[16] On September 23, 2004, plaintiff filed a disability report as part of her application for disability insurance benefits under Title II of the Social Security Act, alleging that her infliction with lumbar stenosis, which was first noticed in a magnetic resonance imaging ("MRI") scan taken on March 24, 2004, has existed since December 13, 2001, the last date she was insured ("DLI").[17]

## I. Plaintiff's Medical History Before The Date of Last Insured

After her December 1994 automobile accident, plaintiff began experiencing back pain and muscle spasms.[18] In 1995/1996 plaintiff sought treatment at the Mayo Clinic for back spasms and lower back pain.[19] At that time, plaintiff was found to have some crushed thoracic vertebrae in her upper back.[20] The 2004 documentation referencing this time period reports that after 1995/1996 the plaintiff subsequently experienced "some intermittent discomfort, but was okay for a couple of years."[21] In fact, in 1996, plaintiff told her doctor that she had no complaints and wanted to discontinue her pain medication.[22]

In March of 1998 plaintiff began to see her primary care physician, Charlotte H. Mitchell,

---

[15]R. 104-05.
[16]R. 559.
[17]R. 100-10, 570, 571 (specifically, R. 100 notes an alleged onset date of 12/13/01).
[18]R. 305, 578.
[19]R. 305.
[20]R. 305.
[21]R. 305.
[22]R. 522.

M.D., of St. James Hospital, for help with lower back pain.[23] In April 1998, medical records indicate that plaintiff had "no complaints."[24] Nonetheless, soon after she began seeing Dr. Mitchell, plaintiff had an MRI taken of her spine.[25] Medical records dated April 14, 1998, from the Department of Radiology at St. James Hospital, indicated that "there is no intervertebral disk space narrowing or degenerative changes. There is a slight lumbar scoliosis demonstrative of a lumbar curvature with convexity towards the left. No bony destructive lesions are noted."[26] On April 27, 1998, the radiologist, Walter S. Tan, M.D., read the results of the same MRI and reported to Dr. Mitchell that plaintiff had a "normal MRI of the thoracic spine," because the saggital scans of her spine "show normal alignment of the thoracic vertebral bodies...no fracture or destructive lesion in the bones...no abnormal focus of increased or decreased signal in the bones...[and] no spinal canal stenosis or herniated disc."[27]

Plaintiff had another MRI taken of her spine on July 13, 1998, which indicated that she had a T12, L1 disk herniation.[28] Dr. Mitchell prescribed physical therapy to help mitigate plaintiff's lower back pain but, according to plaintiff, the pain never subsided. In 2000, Dr. Mitchell began treating plaintiff for a balance problem that was making it difficult for plaintiff to walk without using something to stabilize herself.[29] Plaintiff testified that her balance problems worsened in 2001 because she was walking with a cane.[30] In 2002, Dr. Mitchell reexamined plaintiff's back and found

---

[23]R. 518, 568-69.
[24]R. 526.
[25]R. 544-45.
[26]R. 544.
[27]R. 545.
[28]R. 569.
[29]R. 579-80.
[30]R. 581.

signs of attaxic gate secondary to plaintiff's back.[31]

Between July 13, 1998 and December 31, 2003, the last date on which plaintiff was eligible for DIB and SSI, she had no more MRIs taken of her spine. The SSA tried to obtain sufficient medical records for the period between July 1998 and the end of 2003 documenting the condition of plaintiff's spine during this five year span, to no avail.[32] In this regard, there is only sparse documentation available from plaintiff's physician at the time, Dr. Mitchell. The documentation available indicates that in May of 1999, plaintiff complained of stiffness in her back, but that her back pain was improving by June 1999.[33] A record from June 2001 indicates that plaintiff had a back "flare up" for one month prior to her doctor's visit, where she was prescribed physical therapy.[34] Records from April 2002 indicate that plaintiff had some lower back discomfort and that she "wants [another] order for [physical therapy] because she didn't go before."[35] In May of 2002 plaintiff reported that the physical therapy was helpful, but that she had back stiffness, so it was recommended that she continue physical therapy.[36] The documentation available from this five year time period contains only three references to plaintiff's balance problems, twice in 1999 and once in 2002.[37]

## II. Plaintiff's Medical History After The Date of Last Insured

Plaintiff switched doctors and received medical treatment from Kathryn Burke, D.O., from February 4, 2004 to July 26, 2004.[38] Dr. Burke initially noted that plaintiff had an extremely tense

---

[31]R. 569.
[32]R. 197.
[33]R. 529-530.
[34]R. 531.
[35]R. 532.
[36]R. 532.
[37]R. 529, 531-32, 573.
[38]R. 106, 570.

lumbar musculature and decreased range in motion in flexion and extension, so she scheduled an MRI for March 24, 2004.[39] The MRI revealed that "disc desiccation is evident at L3-4, L4-5 and L5-S1, manifest by a loss of normal disc height and T2 signal intensity."[40] However, the lumbar vertebral bodies remained preserved in height and alignment with no signs of fracture or subluxation.[41] The MRI also demonstrated "normal signal and morphology" of the conus medullaris, the terminal end of the spinal cord,[42] and the cauda equine, the bundle of spinal nerve roots for all the spinal nerves below the first lumbar.[43] At L3-L4 and L4-L5, the MRI showed narrowing of the thecal sac to less than one centimeter in diameter, "secondary to diffuse bulging disc, bilateral facet arthropathy, and hypertrophy of the ligament flavum."[44]

On April 12, 2004, plaintiff received an exam and referral from Richard Freeman, M.D., at the Midwest Minimally Invasive Spine Specialists for her back pain.[45] Between April and August of 2004, plaintiff saw Ramesh P. Kanuru, M.D., of DBA Pain Management Consultants for epidural injections to moderate her back pain, and she visited Midwest Physicians Group, Ltd. for physical therapy.[46] She also took Betra, a muscle relaxer that Dr. Kanuru prescribed to treat her back pain.[47] In July and August of 2004, Aida Spahic-Mihajkovic, M.D., treated plaintiff for her back pain and inability to walk.[48] Dr. Mihajkovic prescribed plaintiff Xanax for her anxiety and Paxil for her fear

---

[39]R. 221, 570.
[40]R. 302.
[41]R. 302.
[42]R. 302; Dorland's Illustrated Medical Dictionary, 378 (28th ed. 1994).
[43]R. 302; Stedman's Medical Dictionary, 328 (28th ed. 2006).
[44]R. 303.
[45]R. 106, 305-07.
[46]R. 106-07.
[47]R. 108.
[48]R. 107.

of falling.[49]

On October 12, 2004, Dr. Burke submitted a report to the Bureau of Disability Determination Services ("BDDS") documenting the condition of plaintiff's spine.[50] In the report, Dr. Burke posited that plaintiff's back problems began sometime "prior to 3/1/04 (approximately) 1995/1996."[51] Dr. Burke noted that the plaintiff complained of pain and noted physical findings concerning plaintiff's need for help walking and standing and her need for constant back support.[52] The report went on to note the presence of lumbar stenosis, and to diagnose the plaintiff with spinal stenosis as well as psychosomatic problems.[53]

On October 12, 2004, Dr. Burke also prepared a Chronic Pain Residual Functional Capacity ("RFC") Questionnaire.[54] Dr. Burke's overall prognosis of plaintiff's condition was poor.[55] The report named an inability to walk without assistance, muscle spasms, and abnormal gait as positive signs of plaintiff's spinal ailment.[56] Dr. Burke further opined that plaintiff was severely limited in dealing with work stress and often experienced severe symptoms that interfered with her ability to concentrate.[57] Dr. Burke surmised that plaintiff would likely be absent from work twice a month as a result of her impairments or treatment for her impairments.[58]

On June 13, 2005, Dr. Spahic-Mihajkovic evaluated plaintiff's health in a Mental Impairment

---

[49]R. 108.
[50]R. 186-88.
[51]R. 186.
[52]R. 186.
[53]R. 186-87.
[54]R. 189-96.
[55]R. 189.
[56]R. 190-91.
[57]R. 192
[58]R. 196.

Questionnaire.[59] Dr. Spahic-Mihajkovic gave her a Global Assessment of Function ("GAF") score of 60-70 out of 90 total points, but noted that plaintiff would likely suffer from chronic panic disorder and a fear of falling for at least twelve months.[60] Mental health professionals use the GAF to convey an individual's psychological, social, and occupational functioning on a spectrum in which scores between 41-50 indicate serious, 51-60 indicate moderate, and 61-70 indicate mild symptoms.[61] Dr. Spahic-Mihajkovic credited mood disturbance, emotional liability, recurrent panic attacks, decreased energy, persistent irrational fears, generalized persistent anxiety, somatization unexplained by organic disturbance, and pathological dependence or passivity as the symptoms on which she based her diagnosis.[62] Dr. Spahic-Mihajkovic's clinical findings were that plaintiff relied on others to physically support herself while walking due to a fear of falling.[63] In her estimation, plaintiff would have moderate restrictions on her activities of daily living as a result of mental impairments, but would seldom experience deficiencies in concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner.[64]

In the same questionnaire, Dr. Spahic-Mihajkovic also assessed plaintiff's mental abilities and aptitudes in relation to the performance of unskilled labor.[65] The questionnaire asked Dr. Spahic-Mihajkovic to rank plaintiff with respect to the abilities listed in terms of "poor," "fair," "good," or "very good."[66] While plaintiff was not "poor" in any category, Dr. Spahic-Mihajkovic noted that

---

[59]R. 200-07.

[60]R. 200.

[61] *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR, 34 (4th ed. 2000).

[62]R. 201.

[63]R. 201.

[64]R. 206.

[65]R. 203-05.

[66]R. 203.

plaintiff had only a "fair" ability to remember work-like procedures, maintain regular attendance, be punctual, perform at a consistent pace, and deal with normal work-stress, including the stress of semiskilled and skilled work.[67] She noted that plaintiff would be "good" at completing a normal workday or work week without interruptions from psychologically based symptoms, being cognizant of normal hazards and taking appropriate precautions, understanding, remembering, and executing detailed instructions, setting realistic goals, and making plans independently of others.[68] The report also stated that plaintiff had a "very good" ability to understand, remember, and implement very short and simple instructions, maintain attention for two hour segments, sustain an ordinary route without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, ask simple questions or request assistance, accept instructions and negative feedback, get along with others without unduly distracting them or exhibiting behavioral extremes, and respond appropriately to changes in a routine work setting.[69]

### III. August 16, 2006 Hearing Before the ALJ

On August 16, 2006, the plaintiff appeared before the ALJ along with two expert witnesses, Daniel V. Girzadas, M.D., an orthopedic surgeon, and Pamela Tucker, a vocational therapist, to comment on plaintiff's medical condition and her ability to hold a job in spite of her impairments.[70]

The ALJ first questioned plaintiff about physical limitations that she had experienced stemming from her back pain and balance difficulties.[71] Depending on the degree of back pain she

---

[67]R. 204-05 (R. 203 indicates that "fair" ability means that the "ability to function in this area is seriously limited but not precluded").

[68]R. 204-05.

[69]R. 204.

[70]R. 557.

[71]R. 560-62.

was experiencing at the time, plaintiff attested that she could consecutively sit for one to two hours and could stand for two to three hours.[72] Plaintiff did testify that she could sit for longer periods of time, provided that she took short breaks to stand up, stretch, and move around.[73] She also testified that with the assistance of a cane or a walker, prescribed by Dr. Burke, she could walk for as long as she wanted.[74] Plaintiff could raise her arms, reach up and touch to the side with both arms, put her arms straight out, move about on her hands and knees, crouch, and even bend at her hips without any assistance, but she required help standing up when she was low to the ground.[75] Plaintiff had no problems with her hands or feet, and she initially testified that she could lift more than five pounds even from a seated position but, upon further questioning, she clarified that she could lift only about five pounds due to arthritis in her shoulder blade.[76] Plaintiff could, however, push and pull a five pound cart with her left arm, and could pull such a cart with her right arm.[77]

The ALJ next questioned orthopedic surgeon Dr. Girzadas about plaintiff's medical conditions within the contexts of the standards governing disability insurance.[78] According to Dr. Girzadas, the medical reports from February 4, 2004 indicated that plaintiff was suffering from mid back pain for 10 years, pain which had been the same since plaintiff's 1994 motor vehicle accident.[79] Dr. Girzadas confirmed Dr. Burke's initial finding of disc desiccation (loss of water content) at L3-L4, L4-L5, L5-S1 and a change in the T2 signal intensity, signifying a degenerative spinal disc

---

[72]R. 560-61.
[73]R. 560.
[74]R. 561.
[75]R. 562.
[76]R. 563-65.
[77]R. 565.
[78]R. 583.
[79]R. 222, 583.

disease.[80] However, he stated that plaintiff's back pain was improving and that the treating physician's recommendation was continued physical therapy for plaintiff's cervical thoracic strain.[81]

Upon being asked to identify which of plaintiff's illnesses have been present for more than one year, Dr. Girzadas listed back pain (present since 1994), balance issues (present since 1999), degenerative disc disease (present since 2004), and mild to moderate stenosis (narrowing of the spine) (present since 2004).[82] Dr. Girzadas noted that these conditions had more than a minimal effect on plaintiff's functioning, but that none of these conditions met or equaled a listing.[83] As far as her RFC, Dr. Girzadas testified that plaintiff had an inability to use ladders, ropes, scaffolds, foot controls or machinery, and to be exposed to heights and vibration.[84] Dr. Girzadas testified that plaintiff could stand or walk for two hours out of an eight hour day but would possibly need to use a cane during that period, walk up stairs or ramps occasionally, and lift ten pounds.[85]

Lastly, the ALJ called vocational therapist Pamela Tucker ("VE") to testify. Before asking for her insights into plaintiff's capacity to work, the ALJ asked her a series of questions that laid a framework within which the VE was to speak about plaintiff's past work experiences and her ability to work despite her medical conditions.[86] First, he asked whether she had heard testimony and had had a chance to review the record.[87] Second, he asked if "the record [was] sufficient for [her] to give [her] impressions as to the past relevant work?"[88] When she responded affirmatively, he asked her

---

[80]R. 585.
[81]R. 530, 589 (Dr. Mitchell is the treating physician).
[82]R. 594.
[83]R. 594.
[84]R. 595-96.
[85]R. 595.
[86]R. 596.
[87]R. 596.
[88]R. 596.

to consider "the dictate requirements of the Dictionary of Occupational Titles ["DOT"] as were revised and all of its intended resources" in telling the court about her impressions of plaintiff's work abilities.[89] Finally, he asked her to tell the court about differences between her impressions and those of the DOT.[90]

The VE classified plaintiff's previous occupational roles as light to medium semi-skilled sedentary positions.[91] When plaintiff held positions as a home attendant and subsequently as a mailroom supervisor, she performed medium semi-skilled work.[92] She did light semi-skilled work as a teacher's aide.[93] The VE suggested that these previous roles had endowed plaintiff with people, analytical, and instructing skills, which could be transferred to perform other types of sedentary semiskilled work.[94]

The ALJ asked the VE to comment on whether there were jobs in the national and local economy for people of plaintiff's age with her education, background and impairments.[95] He asked her to take into account the plaintiff's following limitations: her ability to lift, carry, push, or pull ten pounds or less, sit for six out of eight hours in a day, stand for two out of eight hours in a day, walk two out of eight hours in a day possibly with the aid of a cane, and only occasionally reach overhead, balance, stoop, kneel, crouch, crawl, and climb ramps or stairs.[96] He also asked that the VE consider plaintiff's inability to climb ladders, ropes, or scaffolds, use foot or leg controls, or deal with heights,

---

[89]R. 596.

[90]R. 596.

[91]R. 596-97.

[92]R. 596-97.

[93]R. 597.

[94]R. 599.

[95]R. 597 (there is a discrepancy about whether the VE thought the plaintiff had acquired "instructing" or "constructing" skills, an issue resolved later in this Opinion).

[96]R. 597-98.

moving machinery, or vibration.[97] Considering all of the mentioned restrictions, the VE opined that plaintiff could work as an information clerk, for which the greater Chicago area had six thousand positions, an interviewer, for which two thousand positions existed, and an authorization clerk, for which one thousand positions existed.[98]

**IV. ALJ's January 12, 2007 Decision**

On January 12, 2007, the ALJ determined that plaintiff was not under a disability as defined in the Social Security Act and therefore was not entitled to any DIB.[99] The ALJ began the five step sequential process by noting under step one that plaintiff had not engaged in substantial gainful activity since December 31, 2003 as defined in 20 C.F.R. §404.1520(b).[100] Under step two, the ALJ found that plaintiff suffered from a degenerative disc disease, which caused sufficient limitations to her work related functioning and thus qualified as severe per 20 C.F.R. 404.152(c).[101] He recognized that plaintiff was diagnosed with disc desiccation at the L3-L4, L4-L5 and L5-SI levels in her spine after her DLI.[102] However, he did not engage in an analysis to determine whether the onset date of plaintiff's disc desiccation occurred prior to the DLI because he found that plaintiff's aggregate medical impairments - disc desiccation, mitral valve prolapse, anxiety and panic disorder - did not impair her ability to perform work related activities and were, therefore, non-severe within the context of disability insurance.[103] The ALJ found that plaintiff failed the third step of the process as she lacked an impairment or combination of impairments that amounted to one of the impairments

---

[97]R. 597-98.
[98]R. 598.
[99]R. 11-21.
[100]R. 16.
[101]R. 16.
[102]R. 16.
[103]R. 16-17.

listed in 20 C.F.R. § 404(p) Appendix 1, Listing 1.04.[104] The ALJ listed all impairments found in Listing 1.04, which provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with [either]:evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.[105]

After evaluating the entirety of the record, the ALJ found that plaintiff had a RFC to perform sedentary work.[106] He held that she could lift or carry ten pounds, stand or walk at least two hours in an eight hour day, and sit for six hours in an eight hour day.[107] The ALJ found that plaintiff's other limitations included the use of an assistive device when walking, no use of foot/leg controls, no fine finger manipulation, no climbing ladders, ropes, or scaffolding, and the inability to deal with heights, dangerous moving machinery, or vibration.[108] The ALJ also found that plaintiff could occasionally reach overhead, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.[109] The ALJ, however, noted that plaintiff's descriptions of her daily activities, including her own personal care and grooming, cooking, and dish-washing, were not those which one would expect of a person

---

[104]R. 17.
[105]R. 17-18; 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.
[106]R. 18.
[107]R. 18.
[108]R. 18.
[109]R. 18.

complaining of disabling pain.[110] Additionally, he concluded that the medical evidence - like the March 24, 2004, MRI and the April 12, 2004 physical exam by Dr. Freeman - failed to substantiate plaintiff's subjective complaints of pain.[111] The ALJ noted that the medical evidence provided could reasonably be expected to produce pain, but that plaintiff's statements concerning the intensity, persistence, and debilitating effects of her symptoms were not entirely credible.[112] The ALJ also gave credence to the State Disability Determination Services, who supported a finding of "not disabled."[113]

Finally, the ALJ examined the VE's testimony in assessing whether plaintiff could make a successful adjustment to other work.[114] The ALJ underscored the legal standard, that "if the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' dependant on the claimant's specific vocational profile."[115] Defaulting to the VE's testimony, the ALJ found that the plaintiff possessed occupational skills from her previous work roles that enabled her to adjust to other work that was readily available in the national economy.[116] Based on the VE's testimony, the ALJ listed positions, which plaintiff could easily assume, including an information clerk with 6,000 jobs existing in the Chicago metropolitan area; an interviewer, with 2,000 jobs existing in the Chicago metropolitan area, and; an authorization clerk, with 1,000 jobs existing in the Chicago metropolitan area.[117]

---

[110]R. 18.
[111]R. 18-19.
[112]R. 19.
[113]R. 19.
[114]R. 20.
[115]R. 20 (referencing SSR 83-11).
[116]R. 20.
[117]R. 20.

Assessing plaintiff's age, education, work experience, and RFC, the ALJ concluded that plaintiff was capable of performing other work that existed in significant numbers and, thus, was not disabled under the framework of Medical-Vocational Rules 201.21 and 201.14.[118]

## STANDARD OF REVIEW

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria.[119] Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion."[120] While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."[121] The Court may affirm, modify, reverse or remand the Commissioner's decision only upon ascertaining that the decision lacks sufficient evidentiary support or is undermined by legal error.[122]

## SOCIAL SECURITY REGULATIONS

The Social Security Act requires all applicants to prove that they are disabled as of their DLI to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled: (1) has the claimant engaged in substantial gainful activity; (2) if no, does the claimant have a severe medically determinable impairment or combination of impairments; (3) if yes, is the impairment so severe that it is tantamount to an impairment listed in the social security regulations in impeding the claimant from performing basic work-related activities;

---

[118]R. 20.
[119]*Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).
[120]*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).
[121]*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).
[122]*Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535,539 (7th Cir. 2003); *See also* 42 U.S.C.§ 405(g).

(4) if no, can the claimant perform her past relevant work; (5) if no, can the claimant adjust to perform another type of work existing in a significant number of jobs in the national economy?[123] At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given her limitations.[124] An important notion stressed by the Seventh Circuit underlies the RFC analysis: disability insurance income "is not a form of unemployment insurance and is unavailable if any do-able work exists in the national economy, even if other persons with better skills are likely to be hired instead."[125]

## ANALYSIS

Plaintiff argues that the court should reverse or vacate the ALJ's decision because the ALJ: (1) relied on suspect factors to discount plaintiff's credibility, (2) neglected to articulate a medical basis for finding that plaintiff had the RFC to perform sedentary work, (3) failed to elicit and address inconsistencies amongst the VE's testimony and the DOT, (4) improperly held that plaintiff's aptitudes were transferable skills, and (5) improperly weighed medical sources and overlooked unfavorable medical evidence. The Court now examines each of these allegations.

---

[123]20 C.F.R. § 404.1520(a)(4)(i)-(v).
[124]*Young*, 362 F.3d at 1000.
[125]*Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2001).

## A. The ALJ's Credibility Determination

Plaintiff first argues that the ALJ improperly used evidence of her daily activities to discredit her claims regarding the intensity, persistence, and effects of her medical condition. The Commissioner refutes plaintiff's argument by noting that plaintiff's factual allegations conflicted with evidence in the record and that the ALJ has the authority to weigh evidence and resolve inconsistencies amongst testimonies in determining plaintiff's RFC.

An ALJ's credibility determination is entitled to substantial deference and cannot be invalidated unless proven to be patently wrong.[126] Courts accord substantial deference to ALJs' credibility determinations, because they recognize that ALJs are in "the best position to observe the witness."[127] Social security regulations mandate ALJs to consider a plaintiff's daily activities; dosage, effectiveness and side-effects of medication taken; type of pain treatment other than medication and; reasons the claimant may not seek treatment for pain.[128] The Seventh Circuit has empirically allowed ALJs to evaluate subjective evidence and their observations during the hearing in assessing the severity of a disability as it relates to RFC.[129] ALJs must provide specific reasons and evidentiary support for their credibility findings so that the parties and subsequent reviewers will know what weight the ALJ gave the plaintiff's statements.[130] That said, the Seventh Circuit has rejected claims that an ALJ failed to provide sufficiently specific reasons for his credibility determination where the ALJ thoroughly evaluated the plaintiff's condition and the record.[131]

---

[126]*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

[127]*Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir. 1987).

[128]SSR 96-7p.

[129]*Young v. Sullivan*, 972 F.2d 830, 836 (7th Cir. 1992).

[130]*Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

[131]*Anderson v. Barnhart*, 175 Fed. Appx. 749, 754 (7th Cir. 2006).

Here, the ALJ provided sufficient justification for his credibility determination. He did not find plaintiff's subjective complaints about pain to be credible because her daily activities did not appear to be limited to the extent one would expect of someone who lives with "disabling symptoms and limitations."[132] In her disability report, plaintiff stated that she took care of her own personal care and grooming (with the use of a shower chair), washed dishes while supporting herself on the sink, did laundry (although she could not carry a full laundry basket), and cooked while standing for 20 minutes at a time.[133] The ALJ stated that he tried to further investigate the nature and severity of plaintiff's limitations, particularly the location, duration, and frequency of her symptoms, and the factors that exacerbated the symptoms, as well as the dosage, and side of effects of her treatment.[134] However, he found that the medical evidence did not support plaintiff's subjective complaints of pain.[135] For example, an MRI demonstrated that plaintiff's vertical bodies were well preserved in height and alignment, with no fracture or subluxation in plaintiff's spine.[136] No focal bone marrow signal abnormalities were detected in the MRI.[137] In her April 12, 2004 physical exam, plaintiff's gait was normal and she could heel-to-toe walk easily.[138] Even Dr. Burke noted that plaintiff could lift up to ten pounds and stand or walk for up to two hours.[139] Therefore, it was reasonable for the ALJ to conclude that "while the claimant undoubtedly may experience some pain," she exaggerated her medical condition.

---

[132]R. 18.
[133]R. 111-12.
[134]R. 18.
[135]R. 18-19.
[136]R. 302.
[137]R. 302.
[138]R. 306.
[139]R. 193, 296.

**B. The ALJ's RFC Analysis**

Plaintiff next argues that the ALJ provided no medical basis for rejecting evidence of her physical limitations and that his RFC determination was, therefore, invalid. According to plaintiff, had the ALJ evaluated medical evidence that she had difficulty maintaining balance, lifting more than five pounds, sitting or walking for prolonged periods, and would require periods of standing, stretching and moving about to work a full eight hour day, he would not have found that she was capable of performing sedentary unskilled work. The Commissioner found that the ALJ sufficiently addressed all of the evidence on record and argues that plaintiff failed to provide compelling evidence showing that the ALJ mis-characterized or overlooked evidence.

A claimant's RFC consists of the activities that can be performed despite one's physical and mental limitations.[140] In determining RFC, ALJs evaluate the claimant's age, ability to lift weight, sit, stand, walk, push, pull, and any other factors that would be helpful in gauging the claimant's ability to perform sedentary, light, medium, heavy or very heavy levels of work.[141] During this process, ALJs are expressly prohibited from acting as doctors and making their own independent medical determinations.[142] Once they have determined a claimant's RFC, ALJs are expected to minimally articulate reasons for crediting or rejecting evidence of a disability.[143]

In finding plaintiff capable of performing sedentary unskilled work, the ALJ complied with social security regulations by articulating both an observational and a medical basis for rejecting plaintiff's subjective claims of pain. First, the ALJ explained that plaintiff's subjective complaints of

---

[140]*Hickman v. Apfel*, 187 F.3d 683, 688-689 (7th Cir. 1999); 20 C.F.R. § 404.1545(a).

[141]20 C.F.R. § 404.1567.

[142]*Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (citing *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985).

[143]*Wilder*, 64 F. 3d at 337.

pain, and her claim that any type of movement would exacerbate her pain, were not entirely credible.[144] Plaintiff's daily activities, including her own personal care, grooming, cooking, and dish-washing, "are not limited to the extent one would expect" of someone experiencing disabling pain.[145] Second, the ALJ found that the medical evidence provided reason to believe that plaintiff was in pain, but failed to corroborate her claims regarding the intensity, persistence and debilitating effects of her medical condition.[146] Even the MRI from March 24, 2004, displaying plaintiff's lumbar stenosis condition, showed that plaintiff's vertical bodies were well preserved in height and alignment, with no fracture or subluxation noted.[147] There were no focal bone marrow signal abnormalities detected in the MRI.[148] In her April 12, 2004 physical exam, plaintiff's gait was normal and she could heel-to-toe walk easily.[149] Dr. Burke even reported that plaintiff could lift up to ten pounds and stand or walk for up to two hours in an eight hour day.[150] Third, the ALJ also considered the State Disability Determination Services' finding that plaintiff was "not disabled," recognizing that its opinion does not carry the same degree of weight as plaintiff's treating and examining physicians.[151] Therefore, the ALJ provided a sufficient basis for his RFC determination.

---

[144]R. 18.
[145]R. 18.
[146]R. 18-19.
[147]R. 302.
[148]R. 302.
[149]R. 306.
[150]R. 193, 296.
[151]R. 19.

## C. The ALJ's Questioning of the Vocational Expert

Plaintiff states that the ALJ did not comport with social security regulations requiring ALJs to affirmatively ask VEs whether their evidence presented conflicts with the DOT. According to plaintiff, the VE testified that plaintiff could perform the work of an interviewer, authorization clerk and information clerk, which do not fall within the light "unskilled jobs" category in the DOT, but the ALJ did not investigate this inconsistency to obtain a reasonable explanation. Plaintiff finds fault in the ALJ's decision to ask the VE to recognize differences between her impressions of plaintiff's abilities and those of the DOT before she testified, rather than waiting until after she had testified to ask "if the evidence she provided conflicts with information provided in the DOT."[152] The Commissioner did not find a discrepancy between the VE's testimony and the DOT. The Commissioner also argues that the VE listed occupations that fall under 'light skilled' labor in the DOT by their synonyms, such that plaintiff cannot find the job titles in the DOT even though they are indeed "light skilled" jobs. Consequently, the commissioner argues that the ALJ had no reason to elicit an explanation for the VE's testimony in the first place.

ALJs, who hear testimony from VEs about the requirements of a particular job, have an affirmative duty to inquire about potential conflicts between the VE's findings and information provided in the DOT.[153] If a VE's statements appear to conflict with the DOT, the ALJ must investigate the inconsistency.[154] When an inconsistency arises, the ALJ is not required to default to the DOT over the view of a vocational expert.[155] Automatically deferring to the DOT over a VE's view

---

[152]SSR 00-4p.
[153]*Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006); SSR 00-4p.
[154]SSR 00-4p.
[155]*Donahue*, 279 F.3d at 445.

"would make the [DOT] an independent source of listed impairments, giving the Dictionary's team of authors a power that Congress has bestowed on the Commissioner of Social Security."[156] The DOT is only a tool and does not carry any binding force of law.[157] Plaintiffs may raise conflicts between the VE's testimony and the DOT either during or after the hearing before the ALJ.[158] However, if a plaintiff fails to bring the ALJ's attention to an inconsistency during the hearing by objecting, then plaintiff can only win a claim that the ALJ insufficiently investigated a conflict by proving that the conflict was obvious enough that the ALJ should have independently recognized it during the hearing.[159]

The ALJ satisfied his duty to affirmatively ask whether any inconsistencies between the VE's testimony and information in the DOT existed. Before allowing the VE to state her opinion as to the plaintiff's RFC with respect to the DOT, he asked her to consider the DOT's dictates and to highlight any differences.[160] Plaintiff cites an unpublished district court case to support her argument that posing a hypothetical question asking a VE to identify discrepancies between her expert opinion and the DOT prior to her testimony is legally insufficient.[161] However, while recognizing an affirmative duty to inquire into possible discrepancies between a VE's testimony and the DOT, the Seventh Circuit has not established a singular method by which ALJs must elicit potential conflicts.[162] Therefore, the ALJ satisfied this duty by asking the VE at the onset to describe her findings and to note where she differs from the DOT.

---

[156] *Id.*

[157] *Id.*

[158] *Prochaska*, 454 F.3d at 735.

[159] *Id* at 735-36.

[160] R. 596; *See generally Prochaska*, 454 F.3d at 735; *Donahue*, 279 F.3d at 445-47.

[161] *Harris v. Astrue*, No. 2:06-CV-2222008, slip op. at 8 (N.D. Ind., Feb. 11, 2008).

[162] *Prochaska*, 454 F.3d at 735.

The ALJ also did not err in deciding not to further question the VE because plaintiff did not object to the VE's testimony with respect to plaintiff's ability to work and the inconsistency she now raises is not obvious. The ALJ could not have known that the precise job titles of "interviewer," and "authorization clerk" do not appear in the DOT. Similarly, it is unlikely that the ALJ would have known that the VE's testimony conflicted with the DOT because the evidence as a whole suggested that plaintiff had the ability to perform tasks associated with the jobs that the VE listed. The ALJ had already also determined that plaintiff had a college education and that she could read and write.[163] Dr. Spahic-Mihajkovic's findings - that plaintiff had a very good ability to understand, remember and carry out short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions, and to get along with co-workers or peers - also corroborated the VE's findings.[164] Since plaintiff's counsel did not raise during cross-examination of the VE, or at any other point in the hearing, the discrete inconsistency now raised, the ALJ was not required to further investigate the VE's testimony. Neither the court nor the ALJ has a duty to reopen the record at this time for this issue.[165]

## D. Interpretation of Transferable Skills

In his decision, the ALJ held that plaintiff's people, analytical, and instructing skills constituted transferrable work skills.[166] However, there is some discrepancy concerning whether the VE thought the plaintiff had acquired "instructing" or "constructing" skills.[167] The Court finds that

---

[163] R. 558.

[164] R. 204.

[165] *Donahue*, 279 F.3d at 446 (stating that an ALJ is not required to reopen the record when plaintiff identifies a discrepancy between the VE's testimony and the DOT after the hearing).

[166] R. 20.

[167] *Compare* R. 20 with R. 597.

this mistake is merely a typographical error. The Court cannot determine whether the error is on the part of the ALJ, who was present at the August 16, 2006 hearing and conceivably taking notes, or whether the mistake is on the part of the transcriber who made at least two other transcription mistakes in the record before the Court.[168] There is Seventh Circuit precedent that allows the Court to correct this type of scrivener's error in favor of the ALJ and, thus, the Court has done so here.[169]

That said, plaintiff claims that the ALJ erred in holding that her people, analytical, and instructing skills constituted transferrable work skills, rather than aptitudes. Plaintiff also asserts that even if we assume that her people, analytical, and instructing skills are transferable work skills, the ALJ and the VE both failed to explain how those skills could be applied to other jobs. The Commissioner refutes plaintiff's argument by characterizing transferability with respect to DIB as relating to work activities where individuals can develop expert proficiency. The Commissioner further argues that the Sixth Circuit has held that "effective communication, practical thinking, [and] the ability to deal with various people under adverse conditions" are transferable skills for purposes of social security regulations.[170]

Social security regulations require an ALJ to identify the claimant's acquired work skills and the specific occupations to which the acquired work skills are transferable in his decision.[171] Transferable work skills are defined as "practical and familiar knowledge of the principles and

---

[168]*Compare* R. 221 with R. 570, where the transcriber likely mistyped counsel's reading of the provider's medical notes. *Compare also* the transcriber's continual misspelling of the ME's name with the ME's abbreviated *curriculum vitae* at R. 33.

[169]*See Brown v. Bowen*, 847 F.2d 342 (7th Cir. 1988); *see also Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).

[170] *Levingston v. Comm'r of Soc. Sec.*, 83 F.3d 422 (Table), 1996 WL 189271 at *2 (N. Dist. Ohio. Apr. 18, 1996).

[171]SSR 1982(6).

processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner" to meet the requirements of other jobs.[172] In contrast, aptitudes refer to an "inclination, a natural ability, talent, or capacity for learning."[173] The Seventh Circuit has classified basic work activities or aptitudes - the ability to walk; stand; sit; lift; push; pull; reach; carry; handle; see; hear; speak; understand, execute or remember instructions; use judgment; respond to supervision, and; deal with changes in work setting - as being distinct from transferrable work skills necessary to perform other jobs.[174] However, neither social security regulations nor Seventh Circuit precedent define instructing or analytical skills as aptitudes as a matter of law.[175]

Plaintiff's people skills, instructing skills, and analytical skills can be properly classified as transferrable work skills. In the absence of a clear delineation between work skills and aptitudes in the social security regulations and Seventh Circuit case law on the issue, the court must examine the nature of plaintiff's former position and the positions that the ALJ contends plaintiff can perform despite her limitations to determine whether the skills named are indeed transferable work skills. It would seem that people, instructing, and analytical skills are the very skills that can be acquired from a sedentary supervisory position and transferred to another sedentary supervisory role. An individual can develop expert instructional and people skills by undergoing managerial training or holding a supervisory role. Furthermore, the DOT specifies that: "analyzing needs and product

---

[172]SSR 82-41 § 2 at 197-98 (CE 1982);SSR 1982(2)(b); *see also* 20 C.F.R. § 404.1568(d).

[173] *Morgan v. Sec'y of Health & Human Servs.*, 664 F. Supp. 273, 276 (E. Dist. Mich. 1986) (citing *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310 (6th Cir. 1983)).

[174]*Tom v. Heckler*, 779 F. 2d 1250, 1252 (7th Cir. 1985) (citing aptitude list at 20 C.F.R.§ 404.1521(b)).

[175]20 C.F.R. § 404.1568(d); *Tom*, 779 F.2d at 1252 (stating the ability to work independently, which is listed as a basic work activity in the social security regulations, does not constitute a transferable work skill); *Morgan*, 664 F. Supp. at 276 (holding an ability to "coordinate one's eyes, hands and feet to control the movement of the vehicle," and to "move materials about in a safe manner" constitute aptitudes rather than work skills).

requirements" and "teaching others how to do something" are work skills required to perform the duties of an employment interviewer;[176] "using logic and analysis to identify the strengths and weaknesses of different approaches" and "teaching others how to do something" are work skills necessary to perform the duties of an information clerk[177] and; "using logic and analysis to identify the strengths and weaknesses of different approaches" and "evaluating the likely success of an idea in relation to the demands of the situation" are skills essential to perform the duties of a cash accounting clerk, who is responsible for preparing payroll and authorizing expenditures.[178] It is evident that plaintiff's analytical, instructing, and people skills would enable her to perform other sedentary unskilled positions.

Plaintiff cites *Key v. Sullivan* to support the proposition that ALJs must explain how a person's skills are transferable to other jobs.[179] However, *Key* does not establish a sweeping rule that ALJs must always explain how work skills are transferrable to other positions. In *Key,* the Court determined that the ALJ failed to "identify work skills *actually acquired*" by the plaintiff.[180] The matter at hand is inapposite. As the Court has just explained, it is evident that plaintiff's previous jobs endowed her with the people, instructing, and analytical skills listed by the ALJ. SSR 82-41 requires that the ALJ identify a claimant's acquired work skills, and specific occupations to which the acquired work skills are transferable.[181] The ALJ has done this. SSR 82-41 does not require, as the plaintiff argues, that the ALJ describe how the skills transfer to these jobs.

---

[176] DOT, *available at* http://www.occupationalinfo.org/onet/21508.html (last visited Jan. 1, 2009).

[177] DOT, *available at* http://www.occupationalinfo.org/onet/55305.html (last visited Jan. 1, 2009).

[178] DOT, *available* at http://www.occupationalinfo.org/onet/49023b.html#SKILLS (last visited Jan. 1, 2009).

[179] 925 F.2d 1056, 1062 (7th Cir. 1991).

[180] *Key*, 925 F.2d at 1063 (emphasis in original).

[181] SSR 82-41.

The ALJ fully complied with the requirements of the social security regulations by listing the claimant's transferable skills and the jobs to which they could be applied. The ALJ first acknowledged that plaintiff acquired people skills, instructing skills, and analytical skills from her previous sedentary positions that prepared her well for other sedentary occupations that existed in significant numbers in the national economy.[182] He subsequently stated that given her age, education, work experience, and RFC, plaintiff could perform the requirements of representative occupations such as an interviewer, an information clerk, and an authorization clerk.[183] Therefore, the ALJ did not err in finding that plaintiff had transferrable work skills.

## E. The ALJ's Evaluation of the Medical Evidence on Record

Lastly, plaintiff argues that the ALJ failed to evaluate all of the medical evidence on record at stage three of the sequential evaluation because the ALJ failed to analyze or address the opinions of Dr. Burke. The Commissioner responds by arguing that Dr. Burke is incapable of commenting on plaintiff's medical state before plaintiff's DLI because she became the plaintiff's primary care physician two months after the DLI and presented no medical evidence suggesting that her findings were illustrative of plaintiff's condition prior to 2004. The Commissioner also argues that the ALJ properly decided not to grant equal weight to all of the medical evidence considering there were many inconsistencies amongst the evidence on record.

The ALJ is not afforded unlimited judicial deference but, rather, the ALJ must, in addition to relying on substantial evidence, articulate his or her analysis at some minimal level.[184] Although

---

[182]R. 20.
[183]R. 20.
[184]*See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 393 (7th Cir.1992).

"[i]t is a basic obligation of the ALJ to develop a full and fair record," the ALJ "need not evaluate in writing every piece of evidence in the record," as long as he or she provides a "logical bridge" between the conclusion and the evidence on the record.[185] With respect to medical source evidence, the ALJ's decision in this case does not reflect a thorough evaluation of the evidence as a whole because the ALJ failed to articulate a basis for rejecting the opinions of Dr. Burke. Disappointingly, the ALJ never cited to the opinions of Dr. Burke in his decision and, therefore, it is impossible to tell whether the ALJ examined them at all.[186]

Social security regulations require ALJs to grant controlling weight to physicians' opinions pertaining to the nature and severity of a claimant's medical condition when the medical findings comport with substantial evidence on record.[187] Unless ALJs give a treating source's opinion controlling weight, they must evaluate six criteria in deciding how much weight to afford a medical opinion: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization if applicable; and (6) other factors which validate or contradict the opinion.[188] Here, the ALJ did not give Dr. Burke, one of plaintiff's treating sources, controlling weight, but then failed to articulate his reasoning.

---

[185]*Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir.1991) (quoting *Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir.1978)); *Jones v. Chater*, 1996 WL 390246 (N.D.Ill.1996); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2002).

[186]*See Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994) (finding that a failure to mention significant evidence of record, specifically, an entire line of evidence, warrants remand).

[187]*Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

[188]20 C.F.R. § 404.1520(d)(2)-(d)(6).

From the parties briefs and the record, this appears to be a case of "dueling doctors" where the ALJ must evaluate and resolve a conflict between the opinions of two treating physicians.[189] In the case of dueling doctors, "medical evidence, especially that from a treating physician, 'may be discounted if it is internally inconsistent or inconsistent with other evidence' in the record."[190] In this case, the inconsistency is that the ALJ chose to discuss and give weight to one of plaintiff's treating physician's opinions, who saw plaintiff after her DLI, but not the other treating physician who also saw her after her DLI. The ALJ stated that he afforded controlling weight to Dr. Spahic-Mihakjovic's Mental Impairment evaluation of plaintiff, but provides no discussion or mention of Dr. Burke's evaluations.

The Commissioner is correct that the opinions of both Dr. Burke and Dr. Spahic-Mihajkovic do not relate back to the period prior to plaintiff's DLI and, thus, neither opinion may be particularly probative of plaintiff's condition during the relevant time period. However, the ALJ was still required to articulate his analysis of Dr. Burke's opinion, at least at some minimal level, especially in light of 20 C.F.R. §404.1527, which states that the SSA "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."[191] Further, although the timing of Dr. Burke's reports may have been a reason to discount them, it does not justify ignoring Dr. Burke's opinions in their entirety without explanation, especially since the

---

[189] *See e.g. Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

[190] *Michaels v. Apfel*, 165 F.3d 32 (Table) (7th Cir. 1998), 1998 WL 767142 at *3 (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995)).

[191] 20 C.F.R. § 404.1527(d)(2); *See Young*, 957 F.2d at 393.

ALJ relied on the report of Dr. Spahic-Mihajkovic, which was generated after Dr. Burke's reports.[192]

Dr. Burke became Plaintiff's primary care physician after plaintiff's DLI, and submitted both her BDDS report and her report to plaintiff's counsel eight months after beginning a treating relationship with the plaintiff.[193] As the Commissioner points out, the job of the ALJ was to determine whether plaintiff had a disability that existed *prior* to the expiration of plaintiff's insured status, *i.e.* December 31, 2003, and Dr. Burke's reports clearly post-dated plaintiff's DLI.[194] In *Eichstadt v. Astrue*, the Seventh Circuit addressed evidence that post-dated the plaintiff's DLI, and noted that although that evidence tended to suggest that the plaintiff was currently disabled, it provided no support for the proposition that the plaintiff was disabled at any time prior to the date last insured.[195] Here, we have a similar situation, in that Dr. Burke's reports in the record directly precede a note from the SSA documenting its failed efforts to obtain medical records from the time period between 1998 and 2004, which could have substantiated that plaintiff had a documented disability before plaintiff's DLI.[196] Consequently, in light of the above, the ALJ may have been justified in deciding that Dr. Burke's opinions were unworthy of being given controlling weight but, even if that were to have been the ALJ's reasoning, that analysis still needed to be stated.[197]

---

[192] *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

[193] R. 186-87, 189-96.

[194] *Jeralds v. Richardson*, 445 F. 2d 36, 38-39 (7th Cir. 1971) (refusing to remand because claimant failed to meet his burden, namely, that "the claimant must show that the disability existed prior to the expiration of his insured status.") (*citing Workman v. Celebrezze*, 360 F.2d 877 (7th Cir. 1966)).

[195] *Eichstadt v. Astrue*, 534 F. 3d 663, 666 (7th Cir. 2008).

[196] R. 197.

[197] *See Young*, 957 F.2d at 393; *see also* SSR 96-6p (providing that ALJs are "not bound by findings made by...physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

Therefore, we remand this matter for, if nothing more, further analysis and explanation as to the weight, if any, given to Dr. Burke's opinions and reports. Put another way, if the ALJ rejected Dr. Burke's opinion, that needed to be articulated.

**CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's January 12, 2007 decision lacks evidence of a fully developed record. Accordingly, the Court grants plaintiff's motion to remand [dkt 25] and denies the Commissioner's motion to affirm [dkt 31]. This matter is hereby remanded for further evaluation and explanation regarding the opinions of Dr. Burke.

**IT IS SO ORDERED**

**ENTERED: January 26, 2009**                    _____

**Susan E. Cox**
**UNITED STATES MAGISTRATE JUDGE**